All right, we will now hear argument. We have two cases, Kalitta Air L.L.C. v. Central Texas Airborne System, and I believe we're hearing the two cases separately? Is that right? That's right. And so, are we starting with the merits? That's our understanding, yes. All right. Thank you. You may begin. Good morning, Your Honors. Mark McAlpine for Kalitta Air. If you'll please record, I'd like to reserve five minutes for rebuttal. What can you say in ten minutes about a case that's taken 17 years to evolve? I'm here to answer whatever questions you have. I do want to address a context issue. The A.D., the Airworthiness Directive that started all of this, and I think it's important for most of the issues in the case, needs to be understood that that A.D. evolved in what can only be described as a fishbowl environment, where over a six- or seven-month period of time, the FAA conducted an investigation into the engineering support for this conversion design. Many parties were involved, at least four airlines, a number of financial institutions that had the financing on those planes, aircraft industry associations, and a number of engineering firms, not just throughout the United States, but throughout the world, were involved in trying to address the FAA's concerns about this design. Counsel, may I ask you just some background questions about it? Sure. I'm going to focus on the third trial. And as I understand it, the negligent misrepresentation claim was abandoned. Ultimately, yes. The third trial, for the third trial. I'm talking about the third trial. Yes, Your Honor. I wanted to address that, because I really don't see this as three trials. But I'll get back to that. I want to answer your question. Well, we've been a lot of the records seem like three trials to me. But the third trial was – I call it the sort of a skinny-down trial. It focuses on the doubler. The negligent misrepresentation claim was abandoned. And the claims regarding other negligence issues were abandoned. And the focus was on the doubler. Are we – am I – are we together? We are respectfully not. And that's why I wanted to get to this point. The very first trial was principally against GATEX, the owner of the design. We had lost our negligence claim against CTAS. And we're forced to go to trial only on a negligent misrepresentation claim, which is basically fraud in California law. We won on appeal to get our negligence claim reinstated. And that's what the – what we're calling the second trial started on. But the second trial, as a matter of fact, never ended. It ended in a mistrial, and the court dismissed the case. And we came back to this court and got the court reversed yet again. So what we've been calling the third trial is really just the completion of the second trial, which was a negligence case. So you didn't try the same claims in this trial. Precisely. And that's why we – Right. And in this trial, you abandoned the negligent misrepresentation claim. You told the court that, and the court actually entered judgment. Yes, Your Honor. But the issue that I want to address in your question is the other claims that we did not present. Right. Each of those claims were previously the subject of an evidentiary ruling that made it possible or impractical for us to present them when the second phase of the negligence trial was approved. That was a strategical decision you made. You never made that argument that I could find. Judge, we want to preserve all these other negligence claims. We're abandoning them under duress, and we're only going to go on the doubler. You never made that argument. You said we're going to try it, a pared-down trial, and this is what it's going to be on. Am I wrong on the record? Your Honor, we made it clear that because of the court's  I'm sure I can find the argument I just, that you said you made, that we're abandoning these other claims under duress. Your Honor, we never said we were abandoning them under duress. We simply said we were abiding by the court's evidentiary rulings that prevented us. In other words, what can I do in that, what you've called the third trial, when the court has already told me that the fatigue and damage tolerance analysis under Amendment 45 is not going to be allowed? That was my case during the second trial. But I was told by the court that I was not going to be allowed. And you were abandoned by the Ninth Circuit in saying that there had been no property damage. So in the interlocutory appeal, the Ninth Circuit panel just said no, no property damage. And that, and I think you acknowledge that. That eliminates that line of argument, at least under the economic loss doctrine. Your Honor, certainly that has been CTAS's argument. That was not our argument. Our argument was we've never had the opportunity to appeal that issue. This is our opportunity to appeal that issue. We preserved it by objecting all the way through. Some of these other cases we've  Sotomayor, what bothers me about that, and I know what you're doing, but what bothers me about that is every single issue on that you say you did not have an opportunity to appeal, putting aside those that you did after the first trial, but that was ruled on in the second trial, pertained to matters that were not tried in the third trial. Either they pertained to the negligence misrepresentation claim or they pertained to other negligence claims other than the doubler. And so what you're saying is, well, that's true, but that's because we couldn't bring these claims anymore because of the rulings in the second trial, which we were not able to appeal. Is that what you're saying? I don't exactly, Your Honor. There are the way you're analyzing it, there's two classes of claims. There are claims that were pertaining to the doubler issue, the limitation on the AD, the instructions relative to the AD, the exclusion of the FISDO reports. All of those issues were in trial with the doubler case. We did not, and we believe, we were precluded by evidentiary claims that we had presented in the second trial and won on. We won on. The jury concluded that that accumulation of facts was a basis for negligence finding, and they found that. Well, for that, he was negligent. They didn't actually find negligence because they didn't find that there was a causal relation that caused substantial harm, right? They hung before they got there, yes, Your Honor. I can only describe that as a very brutal trial, and I'm surprised the jury got that far enough. So you rely on, among other things, the order that the district court made on December 1, 2010 that said the Court will not reconsider rulings on motions to eliminate from past trials. And your argument is, therefore, you didn't have to raise the – those objections again in the continuation of the trial. Your Honor, I think the record will show that even with that pronouncement by the trial court, we did refile the majority of those motions eliminated, and they were simply dismissed based on that rationale. Counsel, let's go down them, because I can't – I have – I show that there were five – one, two, three, four – five pieces of evidence that were raised. Not raised in the first – were not raised in the first trial, were raised in the second trial and were dropped for the third trial. And I want to go through those one at a time. The testimony of William Piper, from what I understand, that testimony was offered to establish that CTAS installation and modification services fell below industry standards. In a broad sense, yes, Your Honor. Right. And basically, that testimony did not go to the Doubler issue, but went to the negligence misrepresentation claim, didn't it? That is incorrect, Your Honor. Okay. Tell me why that's incorrect. In the AD itself, one of the reasons given by the FAA for grounding these claims were workmanship issues, workmanship as a result of an inspection of the planes that our client owned and that CTAS modified. Mr. Piper was there to testify both with respect to the existence of those defects and to the issue of whether a fatigue and damage tolerance analysis was required each time CTAS deviated from the STC design. That was all disallowed in the second – what you've called the second trial. Okay. So you – so your position is that Piper was going to testify as to the Doubler and that you did not have an opportunity to appeal that. So if I went back and carefully looked through the record, I would find where in the second trial you said this goes to the Doubler, this – I'm talking about the Doubler in this case, and the defective Doubler. I'd find that. Yes, because there's a split in the issues with respect to Mr. Piper's testimony. The issue he addressed in what we've called the third trial had to do with the standard of care in how the discrepancies were being resolved and what – Let's go to redacting the two FAA reports. Could I just ask a question? Those were Piper's. Oh, I'm sorry. This wasn't covered by the motion eliminate order, though, the 1210 order of the court. This wasn't – these exclusion in the second trial or the first part of the second trial was not done on a motion eliminate, was it? Wasn't it done during the course of the hearing, the proceeding? I believe the majority of the rulings came during the trial, Your Honor. I think there may have been an MIL prior to that that may have touched on it, but I think the majority was that trial. And so is this one of the issues that you raised again in the continuation or did you just rely on that evidentiary ruling in the first part in the second trial? Your Honor, we consider we were in the same trial, so we relied on all of the rulings and the court's pronouncement that she would not reconsider those rulings. Okay. Well, she only said it as to the motions eliminate rulings, right? Did she say something else? I believe she said it a number of times. I know there was a specific instance with respect to the MIL, but there were broader statements that she simply wasn't going to revisit any evidentiary rulings called the second trial. Okay. Maybe you can direct us to that, because I don't remember seeing that. I'm sorry. Go ahead. No, no. I was just going to try to quickly go through these five. Well, can you do that? I wanted to, but I'd wait. I'm in no great hurry. But the question I was going to ask you is, is it significant that the talk about the doubler and the absence of a doubler, as if it was some negligent or something, there was this record would suggest that it was intentional. The testimony was the doubler wasn't necessary when other things were done. But all this case seems to be tried over the absence of the doubler, or that we didn't have it. Well, you didn't have it because we didn't think we needed it. That's what I think the other side would say. It was never an issue. We didn't put a doubler because we didn't see it. But somebody saw that Boeing had something to say about a doubler, and they decided, all right, here we go. We're on the move. We've got an issue, and off we run. Very insightful, Your Honor. Let me separate that a bit. The issue you're talking about in terms of this deliberate decision to exclude was made by the original engineer, Hayes International. They settled on this case a long time ago. However, the engineering analysis, these designs are supported by two fundamental elements, the drawings and the engineering analysis. In this case, the engineering analysis that Hayes, the original designer, created required the doubler. The drawings omitted the doubler. There was an internal inconsistency between the data that was used to approve these STCs, and when the FAA found out about it, they said to Gatex, show me that you can justify ignoring the engineering analysis. No, it wasn't the FDA. It was somebody who had worked for Boeing or had some familiarity with Boeing, who knew that a doubler always was there, and he saw, we don't have a doubler. Uh-oh, let's go, and off we were with the races with the absence of a doubler. But that person wasn't the person who decided whether a doubler was initially necessary or not. The decision had already been made that it wasn't necessary. Your Honor, I am sorely out of running this. I'm not arguing you the case, but I'm trying to convey to you the way I see the posture. It's the core of the case, and if I could take one more minute to address it. The problem is this. Number one, CTAS, years removed from what Hayes did when they designed this design, didn't know any of that. That's why we objected to it coming in at the second, third trial. They didn't know that Hayes had done any kind of analysis, and the record truly shows there was never an analysis. They just winged it and said we didn't need it when they were asked by GATEX whether it should be there. Now, that's in a box. CTAS doesn't know that. Years go by. GATEX itself finds that the doubler is missing on a plane that had sustained structural damage. And they said to CTAS, they're now new engineer, I want to know what's going on here, and by the way, this is GATEX says this, Boeing has a doubler on that plane and you don't have it on mine. Why? They told them to go back and look at that stress analysis that said we need a doubler. They didn't even open the book. They were told to open the book. If they would have opened the book, they would have found the same missing doubler that the FAA found several years later. That's the negligence. You're running out of time, and I wanted to give Judge Black a chance to ask her question. Just two quick ones. The jury instructions regarding Terry Cox. Yes, Your Honor. Okay. My understanding that you wanted an independent contractor instruction in the second trial. We didn't. CTAS did. And that the third trial, it wasn't the same. It may well be. We haven't focused on that. So if it wasn't given, you got what you wanted, didn't you? Your Honor, the complexion of the third case had changed where Mr. Cox's knowledge was no longer necessary to be imputed because a lot of the underlying issues that he was focused on had been wiped out of the case by the evidentiary rulings that we had gotten. It's one of the ones you say.  And then the redacting the two FAA reports. Yes. From your brief, I understood that that went to the negligence misrepresentation claim. No, Your Honor. That is incorrect. Those go to whether CTAS was negligent. That was, in fact, the findings in those reports. But this Court in the first appeal said they were wrongfully excluded at trial. When we went back to put them in the second time, she so substantially redacted them that they were worthless. The jury would have wondered what in the world we were doing with them. Okay. Well, you used up your time, in fact, over. So we'll give you a minute for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. Josh Rosenkranz representing CTAS. Your Honors, I'd like to start where Judge Black started, which was with this strategic judgment. And what Kalita is doing is having made a series of strategic judgments that did not pan out. It is trying to blame the district court. Now, the most important one was the one that Judge Black referred to, the skinning down of the trial. The first two trials, Kalita threw the kitchen sink at CTAS. It wasn't just the doublers. It was bad paperwork. It was faulty drilling. It was rivets. It was the failure to do the stress report. And there was a reason for that, because Kalita was trying to demonstrate that there was damage to the planes to get around the economic loss rule. And that didn't pan out for Kalita. The result is in the various verdicts that came out against Kalita or not resolving causation. Now, by the time Kalita got to the third trial, it made a different strategic judgment. And in my humble opinion, it was a very savvy judgment. Kalita said, out with all of that other stuff. Let's focus on the doubler. Let's focus on the one thing that was responsible for arguably grounding the planes, the one thing that was responsible for the airworthiness directive, and the only thing that will get us the big damages award. Now, why did Kalita do that? It had nothing to do with the previous rulings from the first trial. Well, I mean, I understand they made a strategic change at trial, but I'm not sure why that prevents them from appealing rulings that were made in the first part of the trial or the second trial, depending on which side you're on. We normally say under law of the case doctrine and all that, that you can appeal everything at the end of your trial when everything is appealable. And we do have that, the document they rely on, the order, and perhaps there's something else in the transcript saying, I made my rulings, my evidentiary rulings in the motion 11A, and I'm going to apply them to the next trial. So I guess I'm not seeing what principle or case would prevent them from appealing everything at the end. Well, so, Your Honor, let me answer it in two parts. I don't want to forget to get to the actual thing that the district court did say. But to answer the question directly, the reason it matters is there was one trial here that Kalita is appealing from. That's the third trial. Well, but there was a mistrial. I mean, in order to appeal errors that it saw, it had to seek interlocutory certification. So it really, its chance to appeal everything was at the end. There wasn't a trial that ended in a final judgment that was appealable. As to the second trial. As to the second. As to the first, that's gone. That's gone. And half of these issues relate to things that came up in the first appeal that were never, in the first trial that were never appealed. But the reason it matters is because Kalita has to point to something that went wrong in the third trial, something that affected the third trial, evidence that came in. Why is that? Why can't it point to errors at the beginning of the trial before the mistrial and say that was an erroneous ruling, if the district court had made a correct ruling, we would have gotten a better result, whatever? Sure, Your Honor. If Kalita can connect that to something that it did in the third trial. So, for example, there was a bad instruction that was never given in the third trial. Well, that couldn't have affected the third trial. There was evidence that was redacted in the second trial that Kalita then explains why it's not introducing that evidence in the third trial. Isn't that just a harmless error argument? So Kalita appeals all of these errors and you say it's harmless because they never relied on this when they carried on after the mistrial, when they changed their strategy. But I guess I don't see why they can't appeal it. It's just a matter of whether it's harmless or not. Well, Your Honor, it's more than just harmless. It's a waiver, and here's why. Kalita made the strategic judgment as to why it was going to narrow the case. Now, Kalita explained to the district court why it was narrowing the case. And the single most important piece of paper relevant to this issue is SCR-47, where Kalita explains to the district court exactly why it was skinnied down. And I'll quote, The Ninth Circuit's ruling, which eliminated the need to prove property damage, has dramatically simplified this case. It wasn't the evidentiary rulings. It wasn't the past jury instructions. And what was the consequence? Kalita goes on in the same paragraph. In the retrial of this case, Kalita will not be addressing workmanship issues nor asserting the need for fatigue intolerance analysis. Instead, it will be about the doublers. And Kalita says, It was the missing doubler which caused the FAA to ground the planes. And then later in open court, between the — in a colloquy between the two lawyers, there's an extensive discussion of all the things that Kalita is strategically not raising in this trial. And I'm quoting pages 85 to 86. So we can eliminate some of these issues. So are you saying, is your argument that that's an implicit waiver, or I guess it would be an implicit forfeiture, or are you saying it's an implicit waiver, because they certainly never expressly said, and we agree we will never appeal your evidentiary rulings or other errors that went to things we're now not going to pursue. They didn't say that expressly. So we should read their change in trial strategy as an implicit waiver of any errors that happened before the mistrial. The answer is yes, Your Honor, but I would put it slightly differently if I may offer a friendly amendment, and that is that if Kalita wants to raise errors from the second trial, it has to explain, it has to demonstrate on the record back in real time that the reason it didn't affect the third trial was because it was preserving those errors, and instead — Okay. I didn't see any case supporting that. I mean, that sounds very sensible and the like, but we have a body of case law saying you can raise all the errors at the end of your — of your trial when you have final judgment. Well, no, Your Honor. I would cite to the Court Greenwood from this Court and this Court's rulings on involuntarily abandoning issues, red-lighting nationalist movement from the Eleventh Circuit, that is, and Slavin from this Court. But I never did finish answering the second half of your question, which was the district court never said, I will not reconsider any ruling. The district court said at SCR 54, you can re-argue them to some degree if you think they were wrong. And Kalita had no compunction about raising issues that actually made a difference from the first trial or the second trial in the third trial when they really mattered. What do we do with the order that opposing counsel relies on where the Court says, the Court will not reconsider rulings on motions in limine from past trials except as required by Ninth Circuit rulings? Well, Your Honor, so two things. First, that came after Kalita had abandoned all of its broader claims and narrowed the case down. But secondly, that was modified by the district court's statement, I will consider anything to the extent that you want to raise it. And Kalita raised arguments over and over again into the third trial. The 1987 Hayes analysis was litigated again. When it mattered, Kalita raised it. I also want to mention, because we haven't really discussed it, that half of these issues relate to claims of error that occurred in the first trial. And this Court's law is clear that if they weren't important enough to raise in the first trial, then it's an abandonment of those claims. And to be clear, Kalita raised a lot of things in that first appeal. Kalita raised all sorts of contingent damages claims, which were later played out subsequently in the trials. And so it's not like Kalita didn't have the space to raise additional issues if they were especially important. Now, Kalita's response to that has been, well, the trials were completely different. Well, if the trials were completely different, I don't get where that gets Kalita. Because if the trials were, either it was an error when it occurred or it wasn't. If it was an error, it should have been raised. If it got worse for the third trial, then it was incumbent on Kalita to re-argue it, saying this is so much worse. Now, the Court had a bunch of questions about merits. I'm prepared, I have nothing in particular to say about any of the merits points, unless the Court has questions on the merits. All right, so then let me just wrap up with this observation. It's been 16 years, 17 for Mr. McAlpine. Kalita has had three trials. No jury has ever found CTAS liable for the damage that Kalita claims CTAS was responsible for, and that it claims it suffered. In this trial, the jury sat through 14 days of trial. It deliberated only briefly and unanimously agreed that Kalita had not proven its case as to the very first element, which doesn't even relate to so many of the claims which were about the FAA and that goes to causation. Kalita lost because its new theory was wrong. The jury believed CTAS' expert, that CTAS had gone above and beyond what you would expect from a repair station that is repairing planes to print. And it didn't believe Kalita's expert, who had conceded away the whole case, saying it every step of the way, yes, that was reasonable, and that next step was reasonable, and the last step was reasonable. Kalita had two shots at the broad theory. Kalita had one shot at the narrow theory. It's already recovered $50 million from the people responsible for the design. Kalita lost fair and square. The district court gave Kalita the benefit of every doubt. This court has given Kalita the benefit of every doubt. Kalita's not entitled to a fourth trial. Even interminable litigation has to end at some point, and that point is now your honor's. The judgment should be affirmed. Thank you. Thank you. I'll give you a minute. Beyond the waiver issues, we can't forget the core issue behind our appeal. The rulings that the court made with respect to the FAA, AD, the FSDO reports, the service bulletins, all of those rulings tied our hands at both the second and the third trial. I just want to draw your attention to this one point. This IAI analysis that was done in Israel, that was the final analysis that caused the FAA to issue the AD. The jury was never allowed to hear about that. Based with those rulings, those exclusionary rulings, CTAS stood before that jury and said the FAA conducted no independent analysis, which turned out to be completely false. They knew it, but they got away with it because that very important evidence was in error. No matter how you look at these waiver issues, that issue is squarely in this case, clearly prejudicial, and clearly requires a reversal of the court's judgment and dismissal. And I just want to say one last thing. Yes, it's taken a long time. We've had three trials. We got a lot of bad rulings. This court recognized that and reversed them. We still have not got a fair trial. And along the way, the last two times we've been here, we asked this court, because of the way this trial court has adopted a biased view of the FAA, we're not going to get a fair trial in a final trial. And so we're asking the court the rare remedy of removing the trial court as well. Thank you.
judges: Black, Farris, Ikuta